JUSTICE McKINNON,
concurring.
¶31 I agree with the ultimate resolution reached by the Court regarding Issue 2, but I offer the following analysis to help guide litigants and trial courts in applying the statute.
¶32 To begin, some understanding of the facts is necessary. Colburn was charged with two counts of incest involving his minor daughter, C.C. Colburn was also charged with two counts of felony sexual assault and one count of sexual intercourse without consent involving C.C.’s friend, R.W. At the time of the offenses, both girls were age 11.
¶33 R.W. testified at trial that she and her friend, C.C., used to live in the same apartment building. While visiting C.C., R.W. described how C.C.’s father, Colburn, touched her “top area” and “private part” while she was in Colburn’s living room and, on another occasion, in Colburn’s bedroom. R.W. also described other occasions when Colburn used his “hoy part” to touch the outside of her “private part” and used his mouth on her private part more than once.
¶34 C.C. testified at trial that she and her father would play a game in which she jumped and Colburn would catch her. Colburn’s hand touched her private area. Another time, C.C. testified to Colburn’s hugging her and that Colburn had one hand on her breast. Colburn also touched C.C.’s bottom underneath her nightgown when she was going to bed. C.C. said she saw the keywords “father-daughter sex” on Colburn’s laptop.
¶35 Mary Pat Hansen is a nurse practitioner and clinical supervisor at First STEP Resource Center at St. Patrick’s Hospital in Missoula. The Center is a children’s advocacy center and an adult sexual assault center. Hansen testified at trial that R.W. made several disclosures of sexual abuse by Colburn and stated that, in her opinion, the statements made by R.W. were consistent with a child who has experienced sexual abuse. Hansen related specific examples to the jury of R.W.’s sexual knowledge that a “child may not have unless they’ve had an experience of sexual abuse” which included talking “about his genitals or penis being floppy and hard” and “weird, gross noises that she could hear coming from him while certain acts were going on.” Hansen’s video interview was admitted at trial and played to the jury. *232 ¶36 Hansen also conducted an interview of C.C. C.C.’s trial testimony was consistent with her statements in her interview with Hansen. C.C. also told Hansen that her father told her not to tell anyone about the touching because he would get in trouble. C.C. related to Hansen that her father apologized and that the apologies seemed “sarcastic.” Hansen’s video interview of C.C. was admitted and played to the jury. ¶37 Colburn filed a motion in limine asking the District Court to allow him to introduce evidence of R.W.’s motive to fabricate and to offer evidence of an alternative source of R.W.’s sexual knowledge. More specifically, Colburn sought to introduce evidence that within one month after disclosing against Colburn, R.W. disclosed abuse by her father. Dr. Catherine Otway conducted a forensic interview of R.W. on March 28, 2013 — only several weeks after Hansen’s interview — and reported “she [R.W.] just recently felt comfortable disclosing this information because her mom ‘believed’ her about the sexual abuse by the neighbor, James Colburn.” As a result of R.W.’s subsequent disclosures regarding her father, R.W.’s father was charged with five counts of incest and pleaded guilty to sexual assault. Although R.W. told Hansen in the earlier interview that Colburn was the only person to have ever touched her inappropriately and that she trusted her dad; in fact, R.W. had been abused by her father over a period of several years. Colburn argued that R.W.’s disclosures about Colburn during her earlier interview with Hansen were “testing the waters” to learn her mother’s reaction before being safe to make a more dramatic disclosure regarding her father. Additionally, Colburn sought to introduce evidence of sexual abuse by R.W.’s father as an alternative source of R.W.’s sexual knowledge. The District Court excluded the evidence, concluding that Montana’s rape shield statute prevented admission of the evidence.
¶38 A trial court normally has discretion regarding questions of admissibility of evidence at trial, and we review the court’s evidentiary rulings for abuse of that discretion. State v. Patterson, 2012 MT 282, ¶ 10, 367 Mont. 186, 291 P.3d 556; State v. Stock, 2011 MT 131, ¶ 17, 361 Mont. 1, 256 P.3d 899. However, “in exercising its discretion, the trial court is bound by the Rules of Evidence or applicable statutes, and to the extent that the court’s ruling is based on an interpretation of an evidentiary ruling or statute, our review is de novo. Moreover, where the court’s conclusions of law involve the Constitution or the rules of evidence, our review is, likewise, de novo.” Patterson, ¶ 10; State v. Derbyshire, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811. Here, Colburn raises a constitutional claim — that his right to a fair trial was violated by the trial court’s application of Montana’s rape shield *233 statute. Since the District Court’s interpretation and application of this statute implicate Colburn’s state and federal constitutional rights to a fair trial, we review the court’s ruling de novo.
¶39 “Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants ‘a meaningful opportunity to present a complete defense.’ ” Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 2146 (1986) (quoting Cal. v. Trombetta, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532 (1984)) (internal citations omitted). This includes “the right to put before a jury evidence that might influence the determination of guilt.” Taylor v. Illinois, 484 U.S. 400, 408, 108 S. Ct. 646, 652 (1988). “We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard.” Crane, 476 U.S. at 690, 106 S. Ct. at 2147 (citing In re Oliver, 333 U.S. 257, 273, 68 S. Ct. 499, 507 (1948); Grannis v. Ordean, 234 U.S. 385, 394, 34 S. Ct. 779, 783 (1914)). “That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant’s claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor’s case encounter and ‘survive the crucible of meaningful adversarial testing.’” Crane, 476 U.S. at 691, 106 S. Ct. at 2147 (quoting United States v. Cronic, 466 U.S. 648, 656, 104 S. Ct. 2039, 2045 (1984)).
¶40 “[Sjtate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.” United States v. Scheffer, 523 U.S. 303, 308, 118 S. Ct. 1261, 1264 (1998); see also Crane, 476 U.S. at 689-90, 106 S. Ct. at 2146; Marshall v. Lonberger, 459 U.S. 422, 438, n.6, 103 S. Ct. 843 (1983); Chambers, 410 U.S. at 302-03, 93 S. Ct. at 1049; Spencer v. Texas, 385 U.S. 554, 564, 87 S. Ct. 648, 654 (1967). In Michigan v. Lucas, 500 U.S. 145, 111 S. Ct. 1743 (1991), the Supreme Court recognized that the Sixth Amendment right to present relevant evidence “may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.” Lucas, 500 U.S. at 149, 111 S. Ct. at 1746 (quoting Rock v. Arkansas, 483 U.S. 44, 55, 107 S. Ct. 2704, 2711 (1987)). However, when a state rule of evidence conflicts with the right of the accused to present witnesses, the “rule may not be applied mechanistically to defeat the ends of justice,” but must meet the fundamental standards *234 of due process. Chambers, 410 U.S. at 302, 93 S. Ct. at 1049.
¶41 For example, in Chambers, the defendant was charged with the murder of a police officer. Chambers called a witness who had previously confessed to the murder. Chambers, 410 U.S. at 289, 93 S. Ct. at 1043. When the witness repudiated the confession on the stand, the defendant was denied permission to examine him as an adverse witness based on the State’s “voucher rule,” which barred parties from impeaching their own witnesses. Chambers, 410 U.S. at 294, 93 S. Ct. at 1045. In addition, the state hearsay rule did not include an exception for statements against penal interest, and the defendant was therefore not permitted to introduce evidence that the witness had made self-incriminating statements to three other persons. Noting that the State had not even attempted to “defend” or “explain [the] underlying rationale” of the “voucher rule,” Chambers, 410 U.S. at 297, 93 S. Ct. at 1047, the Supreme Court held that “the exclusion of [the evidence of the witness’s out-of-court statements], coupled with the State’s refusal to permit [the defendant] to cross-examine [the witness], denied [the defendant] a trial in accord with traditional and fundamental standards of due process.” Chambers, 410 U.S. at 302, 93 S. Ct. at 1049.
¶42 That a statute operates to prevent a criminal defendant from presenting an entire defense does not necessarily render it unconstitutional. Rules excluding evidence from criminal trials do not abridge an accused’s right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve. State v. Johnson, 1998 MT 107, ¶ 22, 288 Mont. 513, 958 P.2d 1182 (citing United States v. Scheffer, 523 U.S. 303, 307-08, 118 S. Ct. 1261, 1264 (1998)). Thus, trial judges retain wide latitude to limit reasonably a criminal defendant’s right to cross-examine a witness “based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness’ safety, or interrogation that is repetitive or only marginally relevant.” Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986). Courts are required, on a case-by-case basis, to balance the interests of an evidentiary rule excluding evidence with the defendant’s constitutional right to present a defense. Lindberg, ¶ 56; Lajoie v. Thompson, 217 F.3d 663, 669 (9th Cir. 2000).
¶43 Montana’s rape shield statute, contained at § 45-5-511 (2), MCA, precludes “evidence concerning the sexual conduct of the victim.” The statute provides two narrowly-drawn exceptions: (1) evidence of past sexual conduct with the defendant, and (2) evidence of specific *235 instances of the victim’s sexual activity to show the origin of semen, pregnancy, or disease that is at issue in the prosecution. Neither exception is at issue here. We have consistently recognized that the statutory prohibition of certain evidence in § 45-5-511, MCA, “reflects a compelling interest in favor of preserving the integrity of the trial and preventing it from becoming a trial of the victim.” Anderson, 211 Mont. at 283, 686 P.2d at 199 (brackets, ellipsis, and citation omitted). See also Johnson, ¶ 23; State v. Van Pelt, 247 Mont. 99, 805 P.2d 549 (1991); State v. Higley, 190 Mont. 412, 621 P.2d 1043 (1980). Therefore, to avoid an arbitrary and mechanical operation of the statute which would render it unconstitutional, a defendant’s right to present his defense must be balanced against the interest in preserving the integrity of the trial and preventing it from becoming a trial of the victim.
¶44 This Court has previously recognized that the bar imposed by Montana’s rape shield statute is not absolute. Johnson, ¶ 23. For example, “evidence of prior false accusations of the same sexual crime involved in a more current case, while not admissible for the purpose of impeaching the general character or reputation of the witness, may be admissible if probative of the witness’ state of mind, motive, or biases with respect to making the more current accusations.” Anderson, 211 Mont. at 283, 686 P.2d at 199 (emphasis supplied). Evidence of alleged prior sexual acts of a victim which tend to impugn the victim’s reputation or character “is precisely the type of testimony that the rape shield law was designed to prohibit.” State ex rel. Mazurek v. District Court, 277 Mont. 349, 355, 922 P.2d 474, 478 (1996). However, the policy of protecting against the trial becoming a trial of the victim “is not violated or circumvented if the offered evidence can be narrowed to the issue of the complaining witness’ veracity.” Anderson, 211 Mont. at 284, 686 P.2d at 200. Accordingly, where the evidence is offered to demonstrate a prior false accusation, we have set forth a procedure for the trial court to employ in determining whether to admit the evidence. See Mazurek, 277 Mont. at 358, 922 P.2d at 479.
¶45 Inadmissible evidence under the rape shield statute is evidence of the victim’s sexual conduct offered for the purpose of impugning the victim’s reputation or character and, as a result, rendering the trial a trial of the victim. Mazurek, 277 Mont. at 355, 922 P.2d at 478; State v. Higley, 190 Mont. 412, 621 P.2d 1043, 1050 (1980). It is difficult to imagine a factual situation where evidence would ever be relevant to an issue in the case which had as its only purpose the impugning the *236 victim’s reputation or character. However, sexual conduct evidence which is otherwise inadmissible because it is reputation or character evidence of the victim may still be relevant and probative based upon an alternative theory of admissibility. Thus, we have recognized — in addition to veracity — that evidence of the victim’s sexual conduct may be admissible in rape shield cases when it is relevant and “probative of the witness’ state of mind, motive, or biases with respect to making the more current accusations.” Anderson, 211 Mont. at 283, 686 P.2d at 199.
¶46 Where the sexual conduct evidence is sought to be admitted under a permissible basis for admission, the trial judge must balance the probative value of the evidence, as it relates to the defendant’s presentation of his defense, against the interest in preventing prejudice to the victim and preserving the integrity of the trial, i.e., ensuring that the trial does not become a trial of the victim. The first step of the inquiry focuses on identifying the permissible basis for admission; the second step requires the trial court to balance the probative value of the evidence against the interest in protecting the integrity of the trial. “The constitution does not require a blanket exception to rape shield statutes for all evidence related to motive to fabricate. Speculative or unsupported allegations are insufficient to tip the scales in favor of a defendant’s right to present a defense and against the victim’s rights under the rape shield statute.” Johnson, ¶ 24.
¶47 Finally, the State’s reliance on Van Pelt is misplaced. Van Pelt argued that the .victim could not have consented to any sexual acts because of her young age and that raising prior acts of abuse would not violate § 45-5-511, MCA. Van Pelt, 247 Mont. at 100, 805 P.2d at 550. This Court found, based on the evidence presented, that the prior sexual abuse was not relevant to the issue of whether Van Pelt sexually molested the victim because the knowledge the victim exhibited at trial could not have been gained from the type of prior abuse the victim had endured. Van Pelt, 247 Mont. at 104, 805 P.2d at 552. Indeed, we recognized in Van Pelt that § 45-5-511, MCA, does not provide an “impenetrable wall” of protection for the victim and that the Montana Rules of Evidence certainly allow the credibility of the victim to be attacked. Van Pelt, 247 Mont. at 103, 805 P.2d at 552. The State’s reliance on State v. Stuit, 268 Mont. 176, 885 P.2d 1290 (1994), is similarly misplaced. The issue in Stuit was whether the State had opened the door to sexual abuse evidence during its opening statement and whether Stuit timely objected. Stuit, 268 Mont. at 177, 885 P.2d at 1291. We concluded that the court properly ruled that the prosecutor’s comment did not open the door to testimony regarding the victim’s *237 prior sexual abuse. Stuit, 268 Mont. at 184, 885 P.2d at 1296.
¶48 Colburn contends that his inability to present evidence that the victim was “testing the waters” when she disclosed Colburn’s acts to a forensic interviewer impaired his ability to present an entire defense and to bring out all facts relevant to the issue of the child’s motive to fabricate. The result, Colburn argues, was a partial presentation of the relevant facts to the jury. In contrast, the State presented to the jury a picture of a young victim who made sexually knowledgeable and explicit allegations against her neighbor, with no apparent reason whatsoever to fabricate, supported by a professional’s undisputed assessment that the child was credible because she had sexual abuse-based sexual knowledge. Colburn maintains that the State chose to make R.W.’s sexual knowledge a pivotal issue at trial — the kind that only comes from an experience of sexual abuse — to support the inference that Colburn must have been the source of that sexual knowledge. Colburn maintains that the evidence that R.W. was sexually abused by her father could have rebutted that powerful inference. Colburn also maintains that evidence presented through Dr. Catherine Otway that R.W. disclosed against her father because she “only recently felt comfortable disclosing this information because her mom ‘believed’ her about the sexual abuse by the neighbor, James Colburn” was highly probative of R.W.’s motive to fabricate.
¶49 I agree, after examining the particular facts and the excluded evidence, that evidence related to R.W. testing the waters was relevant to her motive to fabricate. Preventing Colburn from presenting this evidence to the jury violated his constitutional right to present an entire defense. The ability to explore a witness’s biases, prejudices, and motives to fabricate enjoys particular constitutional protection because ofits critical role in a defense. Olden v. Kentucky, 488 U.S. 227, 231-32, 109 S. Ct. 480, 482 (1988); Davis v. Alaska, 415 U.S. 308, 317-20, 94 S. Ct. 1105, 1110-12 (1974).
¶50 Furthermore, evidence that R.W. had been a victim of sexual abuse of her father was relevant to show that R.W. could have learned about the sexual acts and male genitalia other than through sexual abuse by Colburn. The jury did not hear of situations from which R.W. could have gained sexual knowledge as a result of the undisputed abuse she suffered at the hands of her father. The State relied heavily on R.W.’s sexualization in the presentation of its case, supported by Hansen’s assessment of R.W.’s credibility based on her sexual abuse knowledge. Colburn was unable to rebut this powerful inference that he was the only cause of R.W.’s sexualization.
¶51 For these reasons, and pursuant to this analysis, I would conclude *238 that the District Court incorrectly applied the law when it failed to balance Colburn’s constitutional right to present a defense against the interests of the rape shield statute. I join the Court’s opinion regarding Issue 1.